Good morning, everyone. All right, we will hear argument first this morning in case number 22-1925, Barclift v. Keystone Credit Services. Mr. Johnson. Thank you, Judge Meadey. Good morning. May it please the Court. Jesse Johnson on behalf of the appellant, Paulette Barclift. I'd like to reserve three minutes for rebuttal, please. Great. The issue before the Court today is whether my client, Ms. Barclift, adequately alleged concrete injury sufficient to confer Article III standing. In short, yes, she did. Ms. Barclift's personal information, private personal information, was disclosed by a debt collector, Keystone. Keystone shared private details about her alleged debt and about the medical services underlying that debt with a third-party vendor named RevSpring. It shared her information with RevSpring so that RevSpring could print and mail a collection letter to Ms. Barclift. And when Keystone shared that information with RevSpring, it shared it with a company that is a large company with hundreds of employees nationwide with several different print and mail facilities around the country, including one facility that's only 11 miles down the road from Ms. Barclift's home. It's also important that RevSpring has a policy of storing consumer data and storing copies of the collection letters that it prints for potentially years after printing those letters. Let's talk about TransUnion and Spokio, because I think maybe that narrows the focus of our dispute a little bit. I think you would agree that the standing issue is going to turn on whether or not your client has a claim that has a close enough relationship to the kind of suit that could have been historically brought in an American court. Is that essentially the TransUnion test? That's correct, Judge Meade. And here the district court looked to historical precedent in invasion of privacy claims. And it did so under the guidance of three decisions from this court. That would be the St. Pierre decision. That would also be the de Naples decision and the Morales decision. Those decisions were issued between 2018 and 2020. So what's the specific harm that your client is asserting here? Your Honor, the harm is that her private details, personal information, was disclosed without her permission. So what's the claim that you want to use to pin the close relationship test? Your Honor, I think the closest common analog, common law analog, would be the breach of confidence claim. This court considered that claim in the Kamal v. J. Crew case. And essentially a breach of confidence is when nonpublic information is garnered in the context of a confidential relationship. But then that information is shared without the permission of the person whose information it is. Could you be a little bit more specific? What specific harm did Ms. Paulette Barcliff suffer? Was it an economic harm or any other harm that we should be concerned about? Yes, Judge Fuentes. It was not an economic harm. It was an intangible harm. Intangible. Should we be concerned about intangible harms? Yes, Your Honor, we absolutely should. This is very sensitive personal information of hers. It relates to her status as an alleged debtor. I'm sorry. Was that information disclosed to anybody else besides Paulette Barcliff? That information was strictly between Ms. Barcliff and the original creditor, which is a fertility clinic that she had received services from. And then that information was subsequently transmitted to a debt collector. Yes, but that's the – I think, and I'll pick up on Judge Fuentes' point, that that's – the transmission is in communication and communication is in publication. And I know we're kind of bleeding now into the public disclosure claim, not really just a breach of confidence. But do you allege – does the complaint allege that anyone actually ever read this or saw it or that it didn't just move as a data stream from one point to another? Your Honor, we don't know. The complaint does not allege whether a specific person at RevSpring reviewed the information. We were not able to get into the discovery phase to learn how many of the RevSpring employees would have seen Ms. Barcliff's information. Why isn't that the end of it under TransUnion, right? TransUnion seems to suggest that if it's merely an internal disclosure and no one else ever heard about it, then that's not sufficiently public to show a harm of common law. So why isn't that it? I understand, Your Honor. The TransUnion court was looking at a common law analog of defamation. The claim at issue in TransUnion was a Fair Credit Reporting Act claim, and there the court found a common law analog of reputational harm. And so it looked at a claim for defamation, and the court determined that for certain of the class members in TransUnion, their information had not been shared outside of TransUnion, and so a claim for defamation could not lie because no one had perceived the defamatory statement. But here, Your Honor, we are not alleging a reputational harm. We're alleging a harm of invasion of privacy, a disclosure of private information. And according to this court's decisions in DeNables, Morales, and St. Pierre, the disclosure itself is the harm. Was this matter disclosed to the public?  How can you suggest there's harm if the information was not publicly disclosed? Because, Your Honor, there's harm because the information was in fact disclosed to a third party, to RevSpring, the print and mail vendor, and that third party has hundreds of employees, and that third party now has been entrusted with that information. Do you know whether hundreds of any of those employees, you say hundreds of employees, actually had access to this information? Your Honor, we believe that the stored information within RevSpring's servers, yes, its employees did have access to that information. We don't yet know how many of those employees would have seen Ms. Barcliff's personal information, but that's because we were denied that opportunity through discovery. How do you get around footnote 6 of TransUnion, where the Supreme Court says that disclosure to mailing vendors has traditionally not been recognized as breach of confidence? Judge Freeman, when the Supreme Court said that in footnote 6, it was referring to a common law analog of a reputational harm, the defamation claim. And it's important in a defamation claim that the defamatory statement be perceived. If it's not perceived, if it's not a publication, then there couldn't have been a risk to the reputation of those bringing that claim. But here we are bringing a claim with a harm based on disclosure of private information. Isn't the standard higher than the publicity standard for defamation, though? So if anything, doesn't it show that you've got an even heavier burden? I'm sorry, Judge, maybe I couldn't hear the question. Yeah, I'm sorry. Isn't the publication standard even higher than the publicity standard for defamation? So you've got to show even more than TransUnion suggested would be necessary? Your Honor, I believe it's the opposite.  Publicity would have to be broader. But in our view, a publicity is not required here. Again, this Court's decisions in DeNaples and Morales and St. Pierre, they instruct that the disclosure itself is the harm. What happens after that disclosure is irrelevant. In fact, in the DeNaples case, this Court considered the defense argument that there was no allegation that the plaintiff's private information had actually been viewed by anyone. The issue there was that her account number had been printed on the outside of a collection envelope. She brought suit under the FDCPA. And the Court did find concrete injury. One of the defense arguments was that there was no allegation that anyone had actually intercepted the plaintiff's mail, reviewed her account number. And this Court said that did not matter. Concrete injury lied in the disclosure itself. So in TransUnion, the Supreme Court also distinguished between information having been read or simply possessed. And you said you have not alleged that her information was actually read by anyone at RevSprings. Is that correct? It is correct, Judge Freeman. We were not given the opportunity to proceed through discovery to ascertain exactly how many individuals at RevSprings would have reviewed the information. And I understand you're relying on the common law analog of breach of confidence. But what is the confidential relationship that Ms. Barcliff shared with the defendants in this case? So the confidential relationship really emanated between Ms. Barcliff and her medical providers at the fertility clinic, which was the original creditor. And they are not the defendants here? They are not, Your Honor. The defendant here is Keystone, which is a debt collector that was hired by Ms. Barcliff's original creditor in order to send information to her. So wouldn't a breach of the confidence between Ms. Barcliff and her medical provider be a different cause of action? I'm sorry, could Your Honor repeat? Wouldn't it be a different cause of action if she were to pursue relief or breach of confidence from her medical provider? That would be a different cause of action. But, Your Honor, we're looking at not a specific cause of action, but we're looking at the harm emanating from the FDCPA cause of action here. I believe that we're getting a bit far afield as we dig into element by element, whether it's a breach of confidence or whether it's publicity given to private facts. What this Court's precedent instructs is to look at a close relationship between the harms that were addressed at common law and the harms that's being addressed in the statutory violation at issue. And here, the harm that's being addressed is that Ms. Barcliff had her private information shared without her permission, without her knowledge. And, in fact, she's embarrassed by that. It caused her stress. And now her information is no longer within her control. And there's a cause of action under the FDCPA to specifically prevent that. Congress instructed in the FDCPA that one of the aims of the statute is to avoid invasions of individual privacy. And to that end, the section under which Ms. Barcliff sued, Section 1692CB, it outlaws any third-party communications between a debt collector and anyone besides the debtor. There are a few exemptions to that, but those exemptions aren't at issue here. I think TransUnion took us away from their statutory violations into the realm of true harm. And so far I've heard you say that she was embarrassed by this disclosure, but we're uncertain whether anyone actually read the information that Rev. Spring possessed. So where is the concrete harm? Your Honor, the concrete harm is in the disclosure itself. And this Court made that clear in DeNaples and in the St. Pierre and in the Morales decisions. It's the disclosure itself that causes the injury. How does that constitute a harm? I have the same thought.  Well, Your Honor, because disclosing the information on that envelope has now put that information Well, of course, it goes to her. She's concerned that somebody else might have read it. Your Honor, here the information was not disclosed on the outside of an envelope. The information was transmitted between the debt collector and the vendor. And so now that information is being stored on the servers of that vendor for potentially years at a time. Right, and that's the problem. You're saying it's being stored, so there's the potential that someone might see it. Fair enough. But how are we to speculate that anyone actually did see it, given that that's not in the complaint? And can we even speculate about that, given that this is a jurisdictional inquiry? Your Honor, the Court may draw general inferences from the allegations, and the allegations do indicate that there are significant possibilities of her information being used in a way that it should not be viewed by individuals who should not have access to that information. And, in fact, in the allegations, this particular vendor, RevSpring, has a history of having inadvertently leaked the private information of hundreds of medical patients when it mistakenly printed their information on the backside of other patients' bills. It sounds like we would be making a decision on the basis of allegations. Your Honor, I see that I'm out of time now. You can continue. I'm sorry, can you repeat the question? It sounds like you're asking us to make a decision in this case on the basis of allegations. Well, Your Honor, we were dismissed at the pleading stage, and so as of where we were with the district court below, all that we have to work with at this point are allegations, correct. And you think the allegations are enough to sustain your claim? We do think the allegations are enough to sustain the claim and also to establish that Ms. Barcliffe was adequately harmed for standing purposes. And, obviously, this just draws from transunion. If we found that there was jurisdiction, you go to discovery, and it turns out that you can't provide any facts at all, that anyone ever saw this, at that point does jurisdiction vanish in a renewed motion for summary judgment, I guess, on the basis of standing would exist? Because now you're saying, well, it's likely that this happened. It's possible it happened. What if it turns out that it didn't? Would you agree at that point there is no jurisdiction? Your Honor, I would not agree with that based on the de Naples decision. It was not necessary for someone to have perceived the plaintiff's account number there, and here it's not necessary for someone to have perceived Ms. Barcliffe's information. Thank you very much. Thank you. Thank you. Good morning, Your Honors. Good morning. I guess briefly, I think it's important to go back to the history of the FDCPA. It's the Prevent Abusive Debt Collection Practices Act. When it was enacted, it had certain provisions. When this kind of general kind of thought about pursuing claims against third-party lenders, it came to light there is some authority with respect to the disclosure information outside envelopes, meaning through the clear window where, frankly, it would be more akin to an abusive type of process where you're not trying to follow a procedure, where they put a barcode on the outside of an envelope for, theoretically, for the public to see. That may be a disclosure in those cases. At least they recognize the right to bring those claims. And then Hunstein, right, so we don't talk about Hunstein, but Hunstein and its progeny went up and it came back down and went up and came back. There's a full hearing on Bunk and Hunstein III, in which Hunstein, basically following TransUnion, essentially indicated that this is not an actionable claim because why? It's got to be a claim akin to a common law tour. It doesn't have to be perfectly akin. It doesn't have to match, but it's got to be a type of public disclosure. And in that case, the court analyzed what publicity means, what public disclosure means, and essentially the court concluded that the provision of this information to a third-party vendor certainly does not amount to or is not tantamount to a public disclosure. The United Circuit doesn't have the prior decisions that we do in Horizon, in Denapolis, in Kamal, right, where we have seemingly said over and again that the disclosure of private information itself is the harm, right? And I think you'd agree that there was at least some disclosure of private information to the mail vendor. Again, whether it's actionable or a winning claim, leave that aside. There has been the transmission of information from A to B. Why isn't that sufficient under our decisions in Denapolis, for instance? So respectfully, and really the issue here is with respect to whether or not there's a concrete injury for Article III standing under the facts of this case and under the allegations in this complaint to respond to your specific question. What we do have, and I think Your Honor properly articulated the issue, there was a transmission of information to Red Spring, but there's really no actual evidence, even allegation, to say that anyone reviewed it, anyone saw it. But why is that necessary? Hold on. They allege it's a communication, right? That's in the complaint. It was communicated from Keystone to Red Spring. Okay. Why isn't that enough to say, well, that is the transmission, that is the disclosure of private information to a third party? Again, maybe it's not a claim that can succeed on the merits. Maybe it's not one that can succeed on the facts. But why isn't that enough at this initial threshold? So I would go back to TransUnion's clarification with respect to what would be an actionable claim with regard to public disclosure or dissemination of information with regard to public disclosure. And that's where the court really analogized. And I didn't review it and did an analogy. Well, what was the clarification in TransUnion that you're referring to? Well, obviously in a footnote it was dicked in that case, and they basically identified the issue that they said, whether or not it's an invasion or a violation of public disclosure or private acts, the review of the case law, it said, it must be highly offensive, first of all, to a reasonable person in that analogy, what they cited to. They cited a restatement seconded towards 652D, and they said, it instructs publicity, requires communication with so many persons, the matter must be regarded as public knowledge. And that's from TransUnion. TransUnion is indicted basically, courts do not typically recognize disclosures to third party vendors as actionable publications, and publications require that. And they cited an 11th Circuit unpublished decision citing one Georgia case. So I'm not sure what to make of that. I agree with you. It's dicked. It wasn't necessary to the holding, but it's still obviously relevant to this particular case. But how do you, let me ask you this question. If that's right, right, if you need the claim of public disclosure that would be necessary to prevail on a common law claim, then how is it that the TransUnion plaintiffs were able to prevail on their claim? Because the court was very clear in saying that there isn't falsity here. They really were on a terrorist watch list, but it's close enough to the harm that has been asserted. So it can't be that you need all of the elements of publication necessary for the common law tort of a breach of confidence for public disclosure, but then still have a successful claim in TransUnion, because they couldn't have prevailed on the merits of that claim of common law either, right? That's correct. So I want to respond to your inquiry. The first one, though, I do want to note that there is no allegation in this complaint with respect to a breach of confidence claim. The allegation in the complaint is paragraph 91 and 97 of the amended complaint, which basically alleges invasion of privacy. So this creature of a breach of confidence claim, first, they were not privy with that party to begin with, but secondly, that really is a nonexistent claim that's been a fiction of an allegation of a breach. But responding to your question, basically even in Hunstein they address it. Publication is a matter of not a quantitative assessment, but it's a qualitative assessment, basically to say that whether or not disclosure reaches the public. It fails to, and this complaint, frankly, directly on point, it fails to allege how it reached the public. An FDCPA violation itself does not confer standing, right? So they say just because you have a violation doesn't mean, okay, if it's a technical violation it doesn't say we confer standing on the court. But you really need to go, it must be causing evasion of legally protected interests. So what's protected interests? Evasion of privacy akin to a common law tort, and you have to do the analysis to whether it determines it's a public disclosure. And that's where you can even look at your case with referring to the envelopes, the exterior provision of the information, that you can basically conclude that's tantamount to a public disclosure versus to a third-party vendor without any evidence that was only transmitted, anybody reviewed it, but ultimately the nature of the harm even alleged. And that really is ultimately what distinguishes this case from even the other cases where your honors have concluded that there is at least conferred standing to pursue a claim. Let me ask you, when Red Spring gets, let's say, a mailing envelope, what does it do? Does it open it? Does it pass it on? So I think this is a little past where we get, but frankly, for the purposes of your inquiry I will respond as I understand it, right? So we don't have a factual record in this court. It's essentially transmitted by computer. If there was testimony in this case, the testimony would essentially establish that the client, our client, has uploaded it to a computer system, it basically sends it to a computer system, their computer system downloads it on a letter, puts it in an envelope, and it gets sent out. I think essentially that would be the testimony of the evidence in this case. All right, so Red Spring itself doesn't open envelopes and look inside to see what is being transmitted? No. And like I said, I mean, the evidence and testimony is essentially established that it's a computer download, a program, it gets sent, it's received by the receiver, Red Spring, Red Spring prints it out, puts it in an envelope, and sends it out. So the concept that actually anybody, any individual, actually reviewed it, the evidence in this case would have to say, here is this Mrs. Barclift. Does anyone here in this entire company know that you've ever reviewed or received this information? And I would be hard-pressed, I would respectfully submit to you that it would be extremely unlikely under any circumstance that anyone say, I actually saw and reviewed this information. So in Hunstein, the 11th Circuit en banc said that if any element of a common law tort is missing from the modern, you know, the claim being presented, then there's not an adequate match. Do you agree with that? Well, I mean, I think it doesn't have to be, like I said, perfectly akin to every element, right? So the court can look at a statute and determine whether or not this is sufficiently akin to a common law tort, but it essentially has to be consistent with what the courts have recognized as a violation, for example, in this case, or evasion of privacy. And that at least the facts have to be sufficient to confer status upon that plaintiff to pursue the claim. So you're not asking us to adopt the Hunstein reasoning with respect to elements? With the elements with respect to an evasion of privacy, I would respectfully submit that to the extent there is a claim to pursue, it has to be consistent with what the tort would essentially require, recognizing the courts can look at the factors of the case to determine whether or not they're sufficiently akin to those elements to permit a claim to pursue. But at the end of the day, to confer status, you certainly need to have the elements of that claim to exist, to have a rational claim and have an understanding that there is an evasion of privacy to even pursue such a claim under the FDCPA. So essentially the elements of that court need to be established with sufficient facts to be able to support that claim. You disagree there was an evasion of privacy here? I would disagree, Your Honor, respectfully. Was it Barclay? No, Red Spring. Did they not receive an envelope that contained the information that is of concern here to Ms. Barclay? They received, and you go back to responding to your question, they received on their computer, and again, there is no testimony, but my understanding of what the evidence would show, that they received on their computer system information that then it generates because of the format of where the information is input into a computer database, so it's prompted, just as like a PDF form where you're typing in. And what happens with that information once it's in there? Maintained into their servers. It's maintained on their computer system. That's correct. But the disclosure of the information, there's no evidence to suggest that anyone reviewed it, that ever saw it, that ever took access to in any way. Well, in the end, it has to be put in an envelope somewhere and then mailed to, I assume, mailed to Ms. Barclay. That's correct, and again, I didn't get that far into the analysis, but in today's age, I would imagine, and I don't have evidence, but I would imagine it's put into an envelope almost mechanically, like automatically. But even assuming otherwise, someone that actually folded it, you know, and actually licked the envelope or stamped it or pulled the tape off or whatever they did, respectfully. Actually, what I was going to say. Yeah, but even with that, right, there's just no evidence to say, and frankly, they're probably not doing their job if they were sitting there reading someone's letter. I mean, their job in that scenario would be to fold the letter and put it in an envelope. So I don't even think we get to the publicity, to the disclosure of the information, even under that scenario. I mean, if there was that evidence, though, right, if I'm hearing you correctly, if there was evidence that someone went into the data set and looked at Ms. Barclay's information, well, that would be enough, right? I mean, you think there's more than that necessary for the standing analysis? Well, you might say, respectfully, at least under the analysis that TransUnions provides, and either the Hunstein and the other courses, there have been decisions in the Middle District. Obviously, that's not precedential for your New Jersey District Court. Obviously, that's not precedential. But in February, as well as a whole host of other courts, right, the courts have continued to find that the analysis essentially requires public disclosure. The disclosure of the information would be such a harm. And considering the mechanism by which they're trying to pursue this claim under the FDCPA, the FDCPA was enacted to prevent abuses, right? So the question would be, if that evidence exists, is that a public disclosure? It's so outrageous that a reasonable person would conclude that this disclosure in and of itself is actionable. But aren't we – I mean, that's getting to the substantive point of it. Right, but that seems to be where we're getting ahead of ourselves, and that's where it's perhaps a little challenging to apply this test. I – you know, the answer to my question is, well, what if somebody looked at the data set and simply scanned through and saw this sparkless information? Is that enough for standing? And I understand your response to say, well, I don't know that that's enough to prove the merits at common law. But it can't be – but that can't be right then unless we're doing a job-by-job test of the elements of the claim. And at that point, we're just merging this into motions to dismiss and summary judgment and, frankly, trials of the merits. That can't be the Article III inquiry. Well, I would respectfully submit we move to dismiss those claims for those very reasons, that it's certainly not actionable. Sure, but that's a separate procedural statement. No, I understand. But respectfully, that is what Your Honor is asking me. And I would respectfully submit if we were there, I would respectfully say the same to you. No, that's not actionable, Your Honor, under a motion to dismiss. But we're not at that issue. But I do respond. How do we ever get to that if the standing analysis is the same as the – I guess we don't, Your Honor. I mean, that's the issue, right? I don't know where that comes from even in TransUnion is the problem, right? TransUnion – first of all, TransUnion did find standing – footnote six, you know, hypotheticals aside for a moment. After all of this, they did find standing for a defamation claim for a group of individuals who were not falsely accused, right? So it has to be level one. Yes, respectfully, but the facts of that case, right, so Ramirez, TransUnion, the facts of that case are a whole – are significantly different, right? They don't consider publishing information about drug smugglers, potential terrorists, things of that nature, that certainly the facts of that case is certainly not akin to the type of meritorious claim that's being considered in this case. And whether or not – I certainly think that the facts are entirely different. And that is certainly distinguished when we get – when we use that as an analysis. How do we reconcile, just going back to this earlier point, our decisions in cases like de Naples, where we held that the harm underlying the disclosure of private information is action? Wouldn't we have to reject that here to find there's no standing? No, and I think I'd even reference it, and I'd thankfully sought to distinguish that because that issue was raised earlier. That's where, frankly, and we go back, that's actionable under the FDCPA. This Honorable Court determined that was a viable claim. The facts of those cases, if we look at the FDCPA, Abuse of Debt Collection Practice Act, what's the purpose of this? What's the public disclosure in those cases, right? So what happened in those cases? They basically put someone's account information or their collection information in either a sealed or clear envelope or on the outside of the envelope with their account information, right? So when we talk about what the purpose of the FDCPA, whether or not there's an actionable claim, whether or not you're standing to pursue a claim, I certainly, with respect to this Court's determinations, in those cases, that is certainly far akin from what we're talking about in this case where they used a third-party vendor. So those cases on their face, I would suggest that the facts of those cases are clearly distinguishable. Thank you, Counsel. Thank you. May it please the Court, just a few items to touch on based on Mr. Janicek's argument. First, while I don't believe that Mr. Janicek was lying, there is no record evidence of exactly how the information was transmitted to RevSpring, whether it was all automated, whether there was only computers involved, whether there was human interaction with those computers, whether any of the employees would have reviewed that data. We just don't know. And so, again, it's not that I'm refuting or disputing how this happened, but we were denied the opportunity to take discovery, to determine what individuals may have actually seen Ms. Barcliff's information. But, again, to repeat, based on this Court's precedent, whether or not an employee did actually see her information should not be relevant. That is not what gives rise to the concrete injury. It's the disclosure itself that gives rise to that injury. So you don't know for certain whether anyone had access to her personal information? Well, Your Honor, we know for certain that RevSpring had access. We don't know for certain which individuals at RevSpring had access. You say access, but that can mean several things. But do you know if anyone actually read the information that was transmitted? Your Honor, we don't know whether the information was read. Isn't that where the harm comes? No, Your Honor. The harm comes from disclosing the information. To disclose it, you have to have access to the information itself. Well, Your Honor, in the DeNaples decision, this Court considered whether there had to be an allegation of someone reviewing the account information that was printed on the envelope. This Court said no. This Court said that the concrete injury was the disclosure itself and not someone actually reviewing her. But in DeNaples, the QR code was printed on the outside of the envelope, making it available to the public, which is very different from what you're alleging here. Your Honor, that's correct. It was available to the public. But let's take a quick comparison of the DeNaples case and what happened here. In DeNaples, there was a code printed on an envelope. That envelope went from a mailer through the Postal Service and then into the plaintiff's mailbox. Perhaps that took a few days, perhaps a week. Perhaps it was handled by one or several Postal Service employees. We don't know. Here, a similar setup where information was sent to RevSpring. RevSpring then printed and mailed a letter. The letter went through the mail, ultimately made it to Ms. Barcliffe's mailbox. However, unlike in the DeNaples case, now Ms. Barcliffe's personal information is still on a server or could very well still be on the server. We don't know for sure. And that lives there for potentially years, and the potential compromises of that data is something that Ms. Barcliffe must now live with. Since TransUnion, two courts of appeals and several district courts have rejected the precise argument that you're making here, that the disclosure itself was a concrete harm. So have any courts sided with you since TransUnion? Have any appellate courts sided? No, Your Honor. It is true that both the Tenth Circuit and the Eleventh Circuit have sided with the debt collector. I see that my time has expired. May I continue? Go for it. Thank you. But the bottom line is those decisions are in conflict with this circuit's precedent. This circuit in the DeNaples case and the Morales case in St. Pierre make clear that you simply look at the close relationship between the alleged harms. And if I could, just one quick example. If we take the Hunstein Court to its extreme, the Hunstein Court says that you require publicity, some sort of broad publicization of the information to give rise to a concrete injury. An example might be, let's say one of Your Honor's law clerks were to visit a fertility clinic for reproductive health services. And let's say for whatever reason that clinic did not properly process her payment. Her payment gets sent to a debt collector. The debt collector then calls Your Honor or sends an email to Your Honor to inquire about the debt or to put pressure on that law clerk to pay this account. That would be a blatant violation of the law clerk's privacy. It would also be a violation of the FDCPA, the same provision under which Ms. Barclay brings suit. However, under Hunstein, because of that publicity element being missing, Your Honor's law clerk would not be allowed to bring a lawsuit in federal court. And I don't think that's what Congress intended when it passed the FDCPA. Thank you very much. Thank you, counsel. We thank counsel for their arguments.